```
              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MARYLAND

DIANA MINIER,                      :

        Plaintiff                  :

v.                                 :    Civil Action WMN-01-CV-3703

PRISON HEALTH SERVICES, INC.,      :

        Defendant                  :
```

### MEMORANDUM

Before the Court is Defendant's Motion for Summary Judgment (Paper No. 13). The motion has been fully briefed. Upon a review of the pleadings and applicable case law, the Court determines that no hearing is necessary and that the motion should be granted.

### I. FACTUAL AND PROCEDURAL BACKGROUND

As Defendant observes, this case involves the unfortunate pairing of an employee who appears somewhat overly sensitive, with a supervisor who clearly lacks sound people skills. The result is three claims brought under Title VII of the Civil Rights Act for sexual harassment (hostile work environment), constructive discharge, and retaliation. The facts giving rise to this action are largely undisputed, except where otherwise noted.

Plaintiff Diane Minier was hired by Defendant Prison Health Services, Inc. when Defendant replaced the previous medical services contractor for the Maryland Department of Public Safety and Correctional Services facilities in Baltimore City. Upon being

1

awarded the contract, Defendant retained many of the previous contractor's employees, but brought in its own top management. Plaintiff, a Licensed Practical Nurse (LPN), was among the previous contractor's employees who were rehired by Defendant.  Upon rehiring, Plaintiff was given a copy of Defendant's Employee Handbook and signed an acknowledgment of receipt.

During the time period that Defendant was assuming its role under the new contract, Plaintiff approached Herman Kelley, the Infection Control Coordinator for Defendant, about a vacancy in the Infection Control Department.  Kelley interviewed several candidates and selected Plaintiff for the vacancy.  The Infection Control Department consisted of five employees: Kelley; a clerical employee; and two other LPNs in addition to Plaintiff.  Plaintiff's responsibilities included patient treatment at nine clinics throughout the jail complex, AIDS/HIV testing and training of inmates, and the submission of weekly and monthly reports to the Department of Public Safety.

Problems arose between Plaintiff and Kelley soon after her transfer.  Although Plaintiff conveys few specific details or comments, the record contains numerous narratives of Kelley's hostility towards Plaintiff that are not refuted.  What is disputed is the source or cause of that hostility.  Plaintiff asserts that the source of the friction was Kelley's general distaste for women. Plaintiff's sole support for this claim was a one time remark of

Kelley's in which he stated that, "all women are stupid." Opp. at 8.[1] According to Defendant, the source of the friction was Minier's job performance. Mot. at 4.

Plaintiff clarifies that she does not assert that Kelley's hostility was sexual in nature. In fact, Plaintiff volunteers that "Kelley is a homosexual male, and made no sexual advances on Minier, a married woman." Opp. at 7. Thus, Plaintiff's claim for sexual harassment is based on gender prejudice.

Plaintiff first brought her concern about Kelley to Defendant's attention on October 12, 2000, when she spoke to David Thompson, one of Kelley's supervisors. In this conversation, Plaintiff did not relate Kelley's "all women are stupid" comment. Thompson Dep. 85-86. The following day, Plaintiff submitted a four-page internal complaint against Kelley that, again, did not mention the comment. Neither did Plaintiff in the complaint give any indication that she believed that Kelley's treatment of her was motivated by a discriminatory motive. Def.'s Exh. 4. In fact, in supporting her position that Kelley was insensitive, overly sarcastic, and hostile, Plaintiff cites as an

---

[1] Plaintiff's Memorandum in Opposition to Motion for Summary Judgment filed with the Court failed to include numerous pinpoint citations to the record. It would appear that what Plaintiff's counsel submitted to the Court was actually a preliminary draft of the Opposition, to which Plaintiff's counsel intended to add citations, but never did. Rather than comb the entire record for support for Plaintiff's aversions, the Court assumes for purposes of deciding this motion, that these statements are supportable and will simply cite to the opposition memorandum when proper citation to the record is missing.

example Kelley's denigration of a male employee, Vince McKee.  <u>Id.</u> at 3.

On behalf of Defendant, Thompson informed Plaintiff that he would conduct an investigation and pulled Kelley from the office that same day.  Plaintiff Dep. 54.  After the conclusion of that investigation, on October 23, 2000, Thompson issued Kelley a formal written Employee Counseling concluding that Kelley had used inappropriate and threatening tones when speaking to subordinates, and cautioned him that the "use of language that is deemed aggressive and unprofessional will not be tolerated."  Def.'s Exh. 6.  Thompson also informed Kelley that his performance would be reevaluated in one month, and instructed Plaintiff that if she had any further issues with Kelley, she should immediately bring them to himself or to Richard Covert, another of Kelley's supervisors.

On Friday, December 1, 2000, Kelley again used a "loud, hostile" voice with Plaintiff when demanding a monthly report.  Pl.'s Dep. 76.  On the following Monday, December 4, 2000, Plaintiff's next day at work, she asked the facility Deputy Warden to walk her to her office, expressing her fear of Kelley.  <u>Id.</u> at 80-81.  Rather than escort her to her office, the Deputy Warden summoned Thompson, Covert, and the Department of Public Safety's contract monitor to his office.  <u>Id.</u>  In the conversation that ensued, Plaintiff expressed that the situation had not improved and that Kelley continued his harsh treatment toward her.  Def.'s Exh. 7.  Plaintiff related no

"specific dates, details, and witnesses to the alleged events . . . [and also] replied by saying she has many witnesses but she is not going to spend time to write them down or give . . . names." Id. During this group discussion, Covert asked Plaintiff if she would consider a transfer to another facility as a medication LPN. Pl.'s Dep. 86. According to Defendant, the transfer never occurred as another day position was not available and subsequent investigation found "performance issues" existed with Plaintiff that "[t]ransferring to another unit would not resolve . . . ." Def.'s Exh. 7. Plaintiff denies knowledge of any performance issues. Opp. at 17.

On January 1, 2001, Plaintiff submitted her letter of resignation stating that her last day would be January 16, 2001. Opp. at 11. After exhausting her administrative remedies, Plaintiff filed the instant action. Defendant has moved for summary judgment on all claims.

## II.   STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to summary judgment as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A party seeking summary judgment bears the initial responsibility of informing the court of the basis of its motion and identifying the portions of the opposing party's

case which it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When considering the motion, the court assumes that all of the non-moving party's evidence is worthy of belief and justifiable inferences are drawn in favor of the non-moving party.  Anderson, 477 U.S. at 252.  If the movant demonstrates that there is no genuine issue of material fact and that she is entitled to summary judgment as a matter of law, the movant must, in order to withstand the motion for summary judgment, produce sufficient evidence in the form of depositions, affidavits or other documentation which demonstrates that a triable issue of fact exists for trial.  Celotex, 477 U.S. at 324.

**III. DISCUSSION**

    **A. Title VII - Sexual Harassment**

To prevail on a Title VII hostile work environment claim Plaintiff must establish four elements: (1) unwelcome conduct, (2) based on Plaintiff's gender, (3) sufficiently pervasive or severe to alter the conditions of employment and to create a hostile work environment, and (4) some basis for imputing liability to Defendant.  See Matvia v. Bald Head Island Management, Inc., 259 F.3d 261, 266 (4th Cir. 2001).

It is doubtful that Plaintiff can establish any but the first element of a hostile work environment claim.  While Plaintiff points to the single remark of Kelley's which reflects a bias against women,

the remainder of the evidence, including that submitted by Plaintiff, points to the conclusion that, while it is undeniable that Kelley treated others in his department poorly, there was no particular pattern to that ill-treatment.  Plaintiff identifies three women in her department that Kelley treated very well.  Pl.'s Dep. at 33-34.  Corbin Church, one of the other LPNs in the Infection Control Department, testified that Kelley "alienated everyone he came in contact with."  Church Dep. at 28.  Gregory Ridrigs, an RN in one of the clinics, testified that Kelley "spoke to everyone harshly."  Ridrigs Dep. at 36.  Significantly, Kelley was eventually terminated from his position for an incident related to his treatment of a male co-worker.[2]

    As to the pervasiveness and severity of the conduct, the Court finds that Kelley's poor personal skills, persistent demands for work product, and his one time insulting generalization regarding the intelligence of women does not meet the Title VII threshold of a hostile work environment.  "[I]t must be recalled that Title VII's protections do not insulate one from either the normal day-to-day dissatisfactions and annoyances commonly arising in any workplace or from the sometimes unpleasantness of a surly, strict or even personally insufferable and demanding supervisor."  <u>Settle v.</u>

---

[2]Specifically, Kelley was terminated on October 7, 2001, after placing homophobic literature on the desk of an openly homosexual employee in a poor attempt at humor.  Thompson Dep. 126-29.

Baltimore County, 34 F.Supp.2d 969, 991 (D. Md. 1999).

The most significant deficiency in Plaintiff's proof, however, relates to the fourth element. Under the affirmative defense set out by the Supreme Court in Faragher v. City of Boca Raton, 524 U.S. 775 (1998) and Burlington Indus. v. Ellerth, 524 U.S. 724 (1998), an employer can avoid strict liability for a supervisor's sexual harassment of an employee if the employer can establish: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise. Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765.[3]

The employer's obligation to exercise reasonable care is generally satisfied through the production, dissemination, and implementation of an anti-discrimination policy. Here, Defendant did all three. Defendant produced an employee handbook, Def.'s Exh. 2, which Plaintiff acknowledged she received. Def.'s Exh. 1. Defendant also demonstrated that it would enforce the policy when given the

---

[3] An employer is only entitled to raise the Faragher/Ellerth affirmative defense in situations where no tangible employment action was taken against the employee. See Faragher, 524 U.S. at 808; Ellerth, 524 U.S. at 765. Examples of tangible employment action include "discharge, demotion, or undesirable reassignment." Faragher, 524 U.S. at 808; Ellerth, 524 U.S. at 765. Here, the Court finds that the record reveals neither a constructive discharge, nor a denial of a possible transfer, see, infra, the only actions that potentially could be deemed tangible employment actions.

8

opportunity to do so.  In response to Plaintiff's first complaint in October 2000, Thompson requested a detailed written account from Plaintiff; he pulled Kelley from the office that same day; and he interviewed the other employees in the department.  As a result of these interviews, Thompson concluded that Kelley had acted inappropriately and issued Kelley a written counseling.  Also, as noted above, Kelley was terminated in response to a harassment complaint.

The record is clear also that Plaintiff did not act reasonably in bringing the issue of potential sexual harassment to Defendant's attention.  In her initial verbal and written complaints, Plaintiff did not inform Defendant of the one aspect of Kelley's conduct that would have implicated Title VII concerns, the "all women are stupid" comment.  See Def. Exh. 4.  After the investigation of that initial complaint was concluded, Thompson instructed Plaintiff to immediately report any further problems that she had with Kelley.  Thompson heard nothing from Plaintiff until December 4, 2000, when he was called into the office of the Deputy Warden.  Even at that point, Plaintiff refused Thompson's "repeated attempts to have Ms. Minier provide [him] with specific dates, details, and witnesses to the alleged events."  Def.'s Exh. 7.

Thus, the Court concludes that Defendant is entitled to summary judgment on Plaintiff's hostile work environment claim.

**B. Constructive Discharge**

The Fourth Circuit has explained the nature of a constructive discharge claim as follows:

> A constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces [her] to quit [her] job . . . . A plaintiff alleging constructive discharge must therefore prove two elements: deliberateness of the employer's action and intolerability of working conditions.

Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985) (citations omitted), cert. denied, 475 U.S. 1082 (1986).

A plaintiff shows deliberateness "only if the actions complained of were intended by the employer as an effort to force the employee to quit." Id., 770 F.2d at 1255. The second element, intolerability of working conditions, "is assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt compelled to resign." Id. "Dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." Taylor v. Virginia Union Univ., 193 F.3d 219, 237 (4th Cir. 1997), cert. denied, 528 U.S. 1189 (2000). Furthermore, courts have held that the showing of intolerablility required to establish constructive discharge is greater than the showing required to make out a hostile work environment claim. See Breeding v. Arthur J. Gallagher & Co., 164 F.3d 1151 (8th Cir. 1999)(concluding that, while conditions of which plaintiff complained were sufficient for hostile environment claim, they were not sufficient to support finding of constructive discharge).

The Fourth Circuit has cautioned that constructive discharge claims must be "carefully cabined" because they are "open to abuse by those who leave employment of their own accord." Bristow, 770 F.2d at 1255. This Court has explained the reason for that caution:

> An employee may assert a constructive discharge claim only by demonstrating that the employer deliberately made the work conditions so intolerable that no reasonable person would have remained on the job. This rule serves the strong legislative policy in favor of the employee's remaining on the job while [his] claim is being investigated by the EEOC or litigated in the courts. As one court has stated, the standard remedy under Title VII is "to stay and fight."

Diamond v. T. Rowe Price Assoc., Inc., 852 F. Supp. 372, 397 (D. Md. 1994).

Here, Plaintiff asserts that by forcing her to continue to work under Kelley, Defendant created an intolerable working condition. In her Opposition, Plaintiff argues that to obtain summary judgment on this claim, Defendant must establish that Thompson's abrupt withdrawal of the transfer option as 'unwarranted' could not possibly have been intended to push sensitive Diana Minier out of her job." Opp. at 19 (emphasis added). Plaintiff's opposition highlights the deficiency in Plaintiff's constructive discharge claim. While Plaintiff may have felt that she could no longer work under Kelley, there is no showing that Kelley's conduct was objectively intolerable.

### C. Retaliation

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees

11

. . . because [the employee] has made a charge . . . under this subchapter." 42 U.S.C. § 2000e-3 (1994). In order "to establish a prima facie § 2000e-3 retaliation case, a plaintiff must show that: (1) she engaged in a protected activity; (2) the employer took an adverse employment action against her; and (3) a causal connection existed between the protected activity and the asserted adverse action." Von Gunten v. Maryland, 243 F.3d 858, 863 (4th Cir. 2001) (citing Beall v. Abott Laboratories, 130 F.3d 614, 619 (4th Cir. 1997)).

Here, the issue is whether Defendant took an adverse employment action against Plaintiff. Plaintiff asserts that Defendant's "dangling and then withdrawing its offer of a transfer to Minier" is "adequate proof for a prime facie" retaliation case. Opp. at 16. The Court, based on the facts presented, disagrees. In Plaintiff's own words, the extent of any offer of a transfer was as follows. Towards the end of the December 4th meeting, "Mr. Covert said[,] would you be willing to accept a transfer to another department . . . probably MRDCC[?]." Pl.'s Dep. at 86. As Plaintiff got up to leave the meeting, "they said[,] do you think you can work with him just a little bit longer till we see what we can do for you[?]" Id.[4]

It is doubtful that these statements can be construed as an

---

[4] Covert explains that he brought up the possibility of a transfer because "there were rumors flying" that another employee might be leaving that would open up a position for Plaintiff. Covert Dep. at 99.

12

offer of a transfer.  At most, they indicate a willingness on the part of Defendant to look for an alternative position for Plaintiff. Furthermore, the Court notes that, to the extent it was an offer, the offer itself was made <u>after</u> Plaintiff's second complaint.  This undercuts any inference that the "offer" was withdrawn in retaliation for her filing a complaint.   Finally, had there been an offer, the Court finds persuasive Defendant's uncontested representation that the position sought to be accepted by Plaintiff did not exist.

**IV.   CONCLUSION**

    For the foregoing reasons, Defendant's Motion for Summary Judgment will be granted in its entirety.  A separate order will issue, consistent with this memorandum.

                                        /s/

                              _____
                              William M. Nickerson
                              Senior United States District Judge

Dated:     April 10, 2003